UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MELISSA PARKS,                          No. 2:09-cv-03316-MCE-KJN

        Plaintiff,

    v.                                  <u>MEMORANDUM AND ORDER</u>

WESTAMERICA BANCORPORATION
LONG TERM DISABILITY PLAN, THE
LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

        Defendants.

                        ----oo0oo----

    Plaintiff Melissa Parks brings this action under 29 U.S.C.,
section 1101, et seq., seeking benefits under the Westamerica
Bancorporation Long Term Disability Plan issued by Lincoln
National Life Insurance Company ("Lincoln").  This matter was
submitted for a ruling on the briefs without trial.  The Court,
having read and considered the documentary evidence and the
written submissions of the parties, now makes the following
Findings of Fact and Conclusions of Law.  The Court concludes
that Lincoln did not abuse its discretion when it denied
Plaintiff's Long Term Disability Benefits.

1

**FINDINGS OF FACT**


   Plaintiff Melissa Parks was first employed by Westamerica
Bancorporation ("Westamerica") in July 2000.  During her
employment with Westamerica, Plaintiff received many
commendations and appraisals reflecting excellent work
performance and good work ethic.

   Plaintiff participated in a group long term disability plan
that Westamerica created and maintained for eligible employees.
The plan provides for a 180-day Elimination Period during which
no benefits are payable. The plan also provides that Lincoln will
pay a Total Disability Monthly Benefit if, after the completion
of an Elimination Period, an Insured Employee:

   1.   is Totally Disabled;

   2.   is under the regular care of a Physician; and

   3.   at his or her own expense, submits proof of continued
        Total Disability and Physician's care to the Company
        upon request.

   The plan provides for a 24-month Own Occupation Period.
During that 24-month period, the phrase "Totally Disabled" means
that "due to an Injury or Sickness the Insured Employee is unable
to perform each of the main duties of his or her regular
occupation."  The plan further provides that the phrase "main
duties" means those job duties which:

   1.   are normally required to perform the Insured Person's
        regular occupation; and

   2.   cannot reasonably be modified or omitted.

///

2

The plan clarifies that the phrase "main duties" include "those main duties as performed in the usual and customary way in the general workforce; <u>not</u> as performed for a certain firm or at a certain work site." (Emphasis in original.)

The plan expressly provides that, except for those functions which are specifically reserved to the Policyholder or Employer, Lincoln has:

> . . . the authority to manage this Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under this Policy. The Company's authority includes (but is not limited to) the right to:
>
> 1. establish and enforce procedures for administering this Policy and claims under it;
> 2. determine Employees' eligibility for insurance and entitlement to benefits; and
> 3. determine what information the Company reasonably requires to make such decisions.

Plaintiff initiated a claim for benefits under the plan on August 23, 2006.  Plaintiff reported that she had been working for Westamerica as a "Mortgage Processor – Banking" until January 11, 2006, when she stopped working because her "hands and thumbs hurt [carpal tunnel] etc.".  The relevant physical requirements of a mortgage processor, as identified by Westamerica are typing (both hands), calculating (one hand), and writing - repetitive (one hand).

A Physician's Statement completed by Dr. Michael Peterson accompanied Plaintiff's claim.  Dr. Peterson reported that:

1. Plaintiff had been experiencing numbness and tingling in her hands since September 2003;

2. Dr. Peterson first treated plaintiff for that numbness and tingling on October 27, 2005;

///

3

3.   Plaintiff had a right carpal tunnel release surgery on February 7, 2006 and had a left carpal tunnel release surgery on April 25, 2006; and

4.   Plaintiff was unable to perform repetitive actions with her thumbs.

Lincoln acknowledged plaintiff's claim for benefits on September 13, 2006, and requested records from Plaintiff's workers' compensation insurer and from the treating physicians identified by Plaintiff (Dr. Peterson and Dr. John Forsyth). Lincoln forwarded said records to MES Solutions to have them reviewed by a board-certified orthopedic surgeon, Dr. Lawrence Rubens.  After reviewing the records and the job analysis form that accompanied Plaintiff's claim, Dr. Rubens determined that Plaintiff's only restrictions were no repetitive power gripping and no repetitive key pinching with the thumbs.  Dr. Rubens concluded that Plaintiff was capable of returning to work with the above mentioned limitations and that Plaintiff was not considered functionally impaired from her job.

Lincoln asked Dr. Peterson to review and comment on Dr. Rubens' report.  By letter dated December 4, 2006, Dr. Peterson agreed with the work restrictions identified by Dr. Rubens; however, Dr. Peterson reiterated that Plaintiff had informed him that she could not perform the normal functions of her job.  Plaintiff had informed Dr. Peterson that a mortgage processor repetitively uses thumbs and pinching to handle paper work and/or money.  Dr. Peterson also indicated that Plaintiff had attempted to return to modified duty on several occasions.
///

Lastly, Dr. Peterson indicated that the physical demands of her job description require handling frequently and fingering occasionally, which he assumed required use and grasping of the thumbs.

Lincoln determined that Plaintiff was not considered "totally disabled" as defined by the plan.  Lincoln had been paying monthly benefits to Plaintiff based on Plaintiff's initial carpal tunnel disability claim.  On December 22, 2006, however, Lincoln wrote to Plaintiff to advise her that no further benefits would be paid under the plan.  Lincoln's termination of benefits was based on the conclusions of Dr. Rubens and Dr. Peterson that Plaintiff's carpal tunnel symptoms had improved and Plaintiff's only limitation was no repetitive power gripping and no repetitive key pinching with the thumbs.  Lincoln had determined that the major functions of a mortgage processor did not require such movements based on the job analysis form provided as part of Plaintiff's claim for benefits.

By letter dated September 27, 2007, Plaintiff's attorney advised Lincoln that Plaintiff wished to appeal.  Plaintiff's attorney submitted copies of additional records from Dr. Peterson which related to care he provided to plaintiff after November 19, 2006.  These records evidence that Plaintiff:

1.   Underwent right trigger thumb release on December 15, 2006;

2.   Underwent left trigger thumb release on January 19, 2007;

3.   Experienced recurrent triggering on the right thumb;

4.   Underwent revision right trigger thumb release on May 23, 2007;

5. Reported persistent left thumb pain without triggering and continued to demonstrate a weak pinch.

By June 25, 2007, Plaintiff informed Dr. Peterson that her thumbs felt better than before the surgeries and that she would like to return to work.  Dr. Peterson released Plaintiff for light duty work on June 25, 2007.  However, by July 23, 2007, Dr. Peterson decided that Plaintiff should first undergo a functional work capacity evaluation to properly set her restrictions prior to returning to work.  On August 16, 2007, Dr. Peterson concluded that Plaintiff required a permanent modified position because her usual and customary work in banking required repetitive thumb use such as counting money. Dr. Peterson's change in position is solely based on Plaintiff's statements regarding her thumb complaints and job duties. Dr. Peterson restricted Plaintiff from lifting, pushing, or pulling greater than 10 pounds and from repetitive thumb pinching or grasping bilaterally.

Upon receiving the additional records of Dr. Peterson, Lincoln again asked MES Services to have Plaintiff's medical records reviewed by a board-certified orthopedic surgeon.

Dr. William Abraham reviewed the records and found that the new medical records revealed that, after her successful carpal tunnel release surgeries, plaintiff had reported progressive bilateral thumb pain.  Dr. Abraham noted that the records demonstrated Plaintiff's subjective complaints without compelling objective physical examination findings.

///

///

6

Dr. Abraham concluded that "there is nothing in the medical records to support ongoing restrictions or limitations that would render this patient unable to perform daily living and any work activities from 1/20/06 to present."  Dr. Abraham disagreed with Dr. Peterson's opinions about plaintiff's functional capacity, explaining that: "Because one reports subjective discomfort or inability does not mean that one is incapable of doing said activities. There are scant objective physical examination findings in the medical records to support [plaintiff's] complaints."  Dr. Abraham concluded that, "at this juncture [plaintiff] appears to be self-limiting and that there are no physical examination findings to support impairment, restrictions or limitations."

On December 21, 2007 Lincoln forwarded a copy of Dr. Abraham's report to Plaintiff's attorney.  In response, plaintiff's attorney submitted copies of additional records from Dr. Peterson which indicated that plaintiff was considering another surgery (MP fusion) to relieve the pain in her left thumb.  An MRI showed an abnormality along the ulnar accessory collateral ligament.  Dr. Peterson reiterated that Plaintiff's limitations continue to remain the same; no repetitive thumb pinching or lifting, pushing, or pulling over 10 pounds. Dr. Peterson's letter to Plaintiff's counsel dated January 24, 2008, also addresses Plaintiff's symptoms of depression associated with her thumb pain.

///

///

///

Lincoln then forwarded Dr. Peterson's additional records (and the letter from Plaintiff's counsel) to Dr. Abraham for review.  In response, Dr. Abraham acknowledged that an MRI had shown "an abnormality along the ulnar accessory collateral ligament."  Dr. Abraham also acknowledged that an examination had shown "tenderness of the flexor ulnar joint and pain over the flexor surface of the MP joint with any pinching activities." However, Dr. Abraham also explained that "[t]here is nothing new in this information that would impact or change" the findings expressed in his earlier report. Dr. Abraham found that Dr. Peterson's records did not:

1.   offer specific functional testing results or document weakness;

2.   document evidence of sensation change or evidence of reflex sympathetic dystrophy; or

3.   document evidence of progressive muscle atrophy or loss of normal function.

Lincoln sent Plaintiff's attorney a letter on February 22, 2008 explaining that further benefits would be paid for the period between November 19, 2006 and June 25, 2007. Because Dr. Abraham and Dr. Peterson both had indicated that plaintiff could return to work on June 25, 2007, Lincoln also explained that no further benefits would be paid beyond June 25, 2007, because "the medical evidence in Ms. Parks' claim file does not support ongoing restrictions and limitations to render her totally disabled from her occupation as a mortgage servicer from that date (6/25/2007) forward."

///

///

On August 20, 2008, plaintiff's attorney advised Lincoln that plaintiff wished to appeal its determination that no further benefits were payable after June 25, 2007.  In connection with that appeal, Plaintiff submitted additional records from Dr. Peterson, a report prepared by a vocational consultant, and records from a psychiatrist Plaintiff had consulted. On September 18, 2008, plaintiff's attorney also submitted records from a second psychiatrist Plaintiff had consulted.

Lincoln acknowledged both plaintiff's appeal and the materials that plaintiff's attorney had submitted.  Lincoln asked AllMed Healthcare Management to have Dr. Peterson's records reviewed by a board-certified orthopedic surgeon.  Dr. Michael Weiss summarized the significant findings reflected in the new medical records as follows:

> The significant findings that this reviewer sees after reviewing the medical information are that this patient has multiple subjective complaints without significant positive physical findings. Even Dr. Peterson, her treating physician, indicates that she has a lot of complaints without significant findings in a 1/14/08 letter. When this reviewer looks at this entire medical record, it would appear that she has some arthritic complaints related to both thumbs, but her subjective complaints may, in fact, be out of proportion to her objective physical findings.

Dr. Weiss also agreed that "[t]he restrictions placed on this patient's work activities by Dr. Peterson, including no lifting, pushing, or pulling over 10 pounds, and no repetitive thumb use, are reasonable based on this patient's subjective complaints."

///

///

///

9

1  However, he added that according to the Job Analysis form which
2  was submitted with Plaintiff's claim form, the duties associated
3  with her occupation were sedentary, required that she be "able to
4  type, use a calculator, and write," and were "reasonable within
5  the confines of her thumb complaints."  Dr. Weiss concluded that,
6  "[b]ased upon the medical evidence, this person does not appear
7  to have any physical or functional impairments that would have
8  prevented her from doing the tasks and duties of her sedentary
9  occupation from 6/25/07 onward."

10     On October 14, 2008, Lincoln received notice of Plaintiff's
11 Social Security disability determination from Plaintiff.  On
12 October 17, 2008, Lincoln informed Plaintiff that the Social
13 Security award was not binding and would merely be a factor in
14 its decision.  On October 21, 2008, Defendant received a copy of
15 the Social Security disability award.  The letter from Social
16 Security only states that Plaintiff has been determined to be
17 disabled.

18     On November 24, 2008, Lincoln forwarded a copy of Dr. Weiss'
19 report to plaintiff's attorney.  In response, plaintiff's
20 attorney conceded that Dr. Weiss "does not significantly
21 disagree" with Dr. Peterson.  Plaintiff's counsel challenged
22 Dr. Weiss' qualifications to comment on plaintiff's vocational
23 prospects and submitted a supplemental report of a vocational
24 consultant.
25 ///
26 ///
27 ///
28 ///

1    Plaintiff's vocational consultant, Rodney Schilling, M.S.[1],
2   asserted that Lincoln's letter of February 22, 2008 had
3   "simplistic[ally] descri[bed]" the duties of plaintiff's
4   occupation as "sedentary in nature and requir[ing] the ability to
5   type with both hands, use a calculator with one hand, write with
6   one hand."  Because he could find no information about
7   Plaintiff's occupation in the two databases he consulted,
8   Mr. Schilling identified two other occupations he felt were "most
9   similar to the position" Plaintiff held when her disability
10  began.  He opined that because the duties and activities of those
11  occupations "require almost constant writing and/or typing,"
12  their requirements were "above and beyond Ms. Parks' physical
13  limitations."

14      Mr. Schilling's report outlines many duties and important
15  work activities of "similar occupations" but does not identify
16  which duties would be considered the main duties of Plaintiff's
17  actual occupation or how such duties are associated with
18  retentive pinching or grasping.  The report does not discuss
19  which, if any, of the main duties of Plaintiff's occupation could
20  be modified.  Mr. Schilling indicates that he was told by
21  Plaintiff that the amount of times she was required to sign her
22  name was more pinching that she could tolerate; however, among
23  the materials provided to Mr. Schilling was a handwritten letter
24  from Plaintiff detailing her work schedule from 2003 to 2005.
25  ///

26

27      [1] Mr. Schilling's qualifications, education, and experience
28  are not in the administrative record; accordingly, the Court
    cannot fully evaluate his findings as expert opinions.

11

1   Lincoln forwarded Mr. Schilling's initial report to
2   Vocational Coordinator Debora Frazee, M.S. Ed. CRC, for review.
3   Ms. Frazee acknowledged that plaintiff's occupation was not
4   listed in the databases.  After reviewing the analogous
5   occupations identified by Mr. Schilling, Ms. Frazee explained
6   that the applicable database indicated that "fingering" was only
7   a "frequent" activity associated with the duties of those
8   occupations.  Ms. Frazee also referenced the Job Analysis form
9   submitted with Plaintiff's claim form.
10      Mr. Schilling's supplemental report did not comment on
11  Ms. Frazee's opinions; instead he simply restated his prior
12  findings.  Mr. Schilling additionally researched 451 jobs on the
13  O*Net website that he believed were similar in classification to
14  Plaintiff's.  Mr. Schilling concluded that Plaintiff was not only
15  unable to do the duties of her job, but she also was unable to do
16  the vast majority of the jobs for which she is qualified based on
17  her education and experience.
18      Lincoln asked Ms. Frazee to review and comment on
19  Mr. Schilling's supplemental report.  Ms. Frazee explained that
20  the two occupations Mr. Schilling had identified as "similar to"
21  Plaintiff's had sedentary physical requirements.  She then noted
22  that Mr. Schilling researched 451 jobs under the light physical
23  requirement section and not the sedentary section of O*Net.
24  Ms. Frazee also pointed out that the Dictionary of Titles system
25  is the standard by which vocational measurements are made, not
26  O*Net.
27  ///
28  ///

Ms. Frazee also referred to documents which had been attached to her initial report and which explained that "fingering" was only a "frequent" (as opposed to "almost constant") activity associated with the duties of the identified similar occupations.

In August and September 2008, as part of the appeal and well after her disability benefits were ceased, Plaintiff, for the first time, provided information pertaining to her mental health. Plaintiff provided records from Fall Creek Counseling Associates, Rita Kirk, Psy.D.  The records indicate that Plaintiff was evaluated by Dr. Kirk on February 5, 2008, prior to a scheduled surgery.  Dr. Kirk assessed Plaintiff as having a Global Assessment Functioning ("GAF") of 38 with a highest past year GAF of 50.  On February 11, 2008, Dr. Kirk administered the Millon Clinical Mutliaxial Inventory ("MCMI-III").  Based on the MCMI-III results, Dr. Kirk recommended postponing any future surgeries because Plaintiff was frustrated about her ongoing symptoms and needed more time to decide if she wanted to have another surgery. Dr. Kirk also confirmed that the "results of the assessment indicate no significant cognitive impairments in memory or reasoning."  Dr. Kirk made the following recommendations to Workers' Compensation:

1. Evaluation by psychiatrist for a low-dose anti-depressant;

2. 15 individual therapy sessions with a qualified Cognitive-Behavioral Therapist;

3. That Plaintiff further discuss her concerns about surgery with Dr. Peterson.

///

///

Dr. Kirk's records contain one note pertaining to a follow up visit dated July 23, 2008.  At that time, Plaintiff indicated that she was angry with the Workers' Compensation system, absolutely did not want any additional surgeries, was unhappy about seeing a psychiatrist, and had concerns about her finances and continuing thumb pain.  Dr. Kirk indicated that no additional visits were authorized but requested one additional visit at Plaintiff's request.

Dr. Mehtani's records indicate a consultation dated June 13, 2008, concluding the following:

Axis I:   Major depressive disorder, single episode.

Axis II:  Compulsive personality traits.

Axis III: Chronic pain.  Bilateral carpal tunnel syndrome, trigger fingers.

Axis IV:  Psychosocial stressors moderate to severe. Problems with living situation and chronic pain.

Axis V:   GAF 40, in the past year 60.

Lincoln arranged for the mental health records to be reviewed by Lisa Paige, a certified master social worker and licensed mental health professional.  Ms. Lewis explained that the materials contained no evidence that plaintiff was diagnosed with or treated for a mental illness prior to February 5, 2008. She also explained that:

1.   When plaintiff first consulted a mental health provider, she "evidenced no significant cognitive impairment in memory or reasoning." Instead, plaintiff "was evaluated to determine current mental status regarding pain and functional capacity impacting decision for surgery."

///
///

14

2.   The initial mental health diagnosis (by Dr. Kirk)
     included both Axis I and Axis II symptoms. The
     Axis I diagnosis "is often used when situational
     factors affect an individual's mental state but
     symptoms are short-term and not typically
     experienced in intensity, duration or frequency to
     suggest they would interfere with functioning."
     The Axis II diagnosis involved characteristics
     plaintiff "would have had . . . while maintaining
     full-time employment;" and

3.   The second mental health provider (Dr. Mehtani)
     diagnosed plaintiff to suffer from "major
     depressive disorder single episode (severity not
     specified)," but produced "incomplete follow up
     notes" regarding two subsequent sessions.

Ms. Lewis also explained that the materials submitted "indicate [claimant's] symptoms are reactions to difficult external circumstances . . . but not indicative of global psychiatric impairment." Adding that plaintiff's "treatment is conservative and symptoms are not described in intensity, duration, or frequency to suggest they would interfere with functioning," Ms. Lewis concluded that the materials did not support any restrictions and limitations based on a psychiatric illness "that would prevent [claimant] from performing the essential functions of [claimant's] occupation."

Reiterating its prior decision terminating Plaintiff's disability payments, on February 4, 2009, Lincoln wrote to Plaintiff's attorney to explain that it was unable to approve benefits beyond June 25, 2007.  Lincoln concluded Plaintiff "could work in a sedentary job on a full-time basis," that there were "no physical or functional impairments that would have prevented her from doing the tasks and duties of her sedentary occupation from 6/25/07 onward," and that mental health care she had received did not indicate treatment prior to February 5, 2008.

15

1  The mental health care also involved symptoms which were "not
2  described in intensity, duration or frequency to suggest they
3  would interfere with functioning or performing the main duties of
4  her occupation."

5      On March 31, 2009, Plaintiff's attorney advised Lincoln that
6  Plaintiff wished to initiate a second appeal from Lincoln's
7  decision.  Plaintiff's counsel acknowledged that Dr. Weiss and
8  Dr. Peterson "do not disagree about [plaintiff's] functional
9  capacity."  Plaintiff's attorney submitted additional records
10 from Dr. Peterson and Dr. Mehtani in connection with plaintiff's
11 second appeal.

12     Dr. Peterson's additional records evidence that Plaintiff
13 received a second opinion from a U.C. Davis physician.  The U.C.
14 Davis report is absent from the records; however, on July 17,
15 2008, Plaintiff informed Dr. Peterson that her impression was
16 that the U.C. Davis physician thought it was "all in her head."
17 Dr. Peterson reiterated that Plaintiff has bilateral thumb pain
18 with intermittent triggering in her right thumb.  Plaintiff
19 continued to be limited in repetitive gripping or grasping tasks
20 with either thumb.

21     Dr. Mehtani's records evidence that a Medical Source
22 Assessment (Mental) was performed on March 3, 2009.  This form
23 indicates that Plaintiff posited either an inability, or
24 inability for more than 20 percent of a workday, in all standard
25 work-related mental functions; however, the "General Functional
26 Capacity Assessment" portion was not filled out and there are no
27 accompanying chart notes.  Accordingly, there is no explanation or
28 justification provided for these allegedly deficient capacities.

16

Lincoln acknowledged Plaintiff's second appeal and again asked that AllMed Healthcare Management have a board-certified orthopedic surgeon review the records.  Dr. James Scalone reviewed the records and explained that the results of Plaintiff's EMG/NCV testing were "normal," and that the objective findings regarding Plaintiff's continued complaints of thumb pain were "limited to what appear to be Notta's nodules."  Dr. Scalone therefore explained that, while the limitations placed on Plaintiff's work activities might be appropriate in light of her subjective complaints, they were "not consistent with the objective findings."

Dr. Scalone also reviewed an occupational analysis regarding one of the occupations (mortgage servicer) similar to Plaintiff's and vocational evaluations for other occupations (mortgage clerk and loan interviews clerk). Dr. Scalone explained that "[t]he objective features did not support a limitation precluding the patient from performing the duties described in the occupational analysis or the vocational evaluation." Dr. Scalone concluded:

> Based on the medical evidence, and specifically the objective features of the case, the patient did not have any physical or functional impairment that would have prevented her from performing the essential tasks and duties of a sedentary level occupation as of 6/25/07 to the current date ... With these findings, this patient should be capable of performing the essential tasks and duties of a sedentary occupation as of 6/25/2007.

On July 6, 2009, Lincoln forwarded a copy of Dr. Scalone's report to plaintiff's attorney for comment.  Plaintiff's counsel acknowledged the letter but submitted nothing in response.

///

///

1    Lincoln also asked AllMed Healthcare Management to have the
2    additional mental health records reviewed by a board-certified
3    psychiatrist.  Dr. Stefan Kruszewski explained that plaintiff's
4    psychiatric history was limited to a consultation with Dr. Kirk
5    (on 2/5/08), testing (on 2/11/08), and a consultation with
6    Dr. Mehtani (on 6/13/08).  Dr. Kruszewski stated the "records
7    suggest that this patient has underlying significant personality
8    disturbances, inconsistency in reporting her symptoms,
9    inconsistency in following prescribed regimens of treatment, and
10   lack of sufficient detailed follow-up to assert that she is
11   incapable of functioning socially and in a current or different
12   work environment."  Dr. Kruszewski also explained that, even if
13   plaintiff had some global psychological impairment of
14   functioning, it did "not preclude her ability to work in her own
15   or any other sedentary occupation from 6/25/2007."
16   Dr. Kruszewski opined that there was "no clear evidence in the
17   patient's psychiatric record of any psychological impairment that
18   would restrict her from any particular career, including her
19   current position."  Dr. Kruszewski mistakenly identified the
20   administrator of the MCMI-III as Dr. Theodore Millon.[2]

21        On July 6, 2009, Lincoln forwarded a copy of
22   Dr. Kruszewski's report to plaintiff's attorney for comment.
23   Plaintiff's attorney submitted a letter from Dr. Kirk that did
24   not provide any additional information about Plaintiff.
25   ///

26
27        [2]  Dr. Millon is an 80-year-old, world-renowned researcher,
     founder of his own research institute in New York and author of
     the MCMI-III test instrument.  Dr. Millon's name appears on the
28   cover sheet of the MCMI-III Report.

18

1  Instead, the letter dated August 10, 2009, only clarified that
2  Dr. Kirk had administered the tests which were performed on
3  February 11, 2008.  Dr. Kirk also explained who Dr. Millon was
4  and expressed doubts as to Dr. Kruszewski's competence based on
5  such a mistake.

6      On August 10, 2009, Lincoln sent plaintiff's attorney a
7  letter to explain that it was unable to approve benefits under
8  the Plan for the period after June 25, 2007.  With respect to
9  Plaintiff's complaints of thumb pain, the letter explained that
10 Dr. Scalone had concluded "the patient did not have any physical
11 or functional impairment that would have prevented her from
12 performing the essential tasks and duties of a sedentary level
13 occupation as of 6/25/2007 to the present date." With respect to
14 plaintiff's mental health issues, it explained that Dr.
15 Kruszewski had concluded "[t]he records suggest that this patient
16 has underlying significant personality disturbances" but "do not
17 show enough support for limitations on this patient" based on the
18 lack of treatment of an intensity, a duration, or frequency that
19 would be indicative of a condition that would prevent Plaintiff
20 from working.  Lincoln also concluded that the mental health
21 condition could not be covered, even if found to be disabling,
22 because the first evidence of Plaintiff treating for a mental
23 health condition was on February 5, 2008, 7 months after the
24 June 25, 2007 termination of disability.
25 ///
26 ///
27 ///
28 ///

1        Plaintiff argues that Lincoln's actions failed to address

2   the physical and mental issues of the Plaintiff because:

3        (1)   every doctor who personally examined Plaintiff
                concluded that she was disabled;
4
5        (2)   the plan administrator demanded objective tests to
                establish the existence of a condition for which
6               there are no objective tests;

7        (3)   the administrator failed to consider the Social
                Security disability award;
8
9        (4)   the reasons for denial shifted as they were
                refuted, were largely unsupported by the medical
                file, and only the denial stayed constant; and
10
11       (5)   the plan administrator failed to engage in the
                required "meaningful dialogue."
12  Plaintiff argues that further skepticism is warranted because the

13  record reflects a parsimonious claims granting history.

14

15                          **CONCLUSIONS OF LAW**

16

17       "A civil action may be brought by a participant or

18  beneficiary ... to recover benefits due to him under the terms of

19  his plan, to enforce his rights under the terms of the plan, or

20  to clarify his rights to future benefits under the terms of the

21  plan." 29 U.S.C. § 1132(a)(1)(B).  The parties do not dispute

22  that Plaintiff is a participant entitled to bring such an action.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

                                 20

1     **A.   Standard of Review**

2

3     A "denial of benefits challenged under 29 U.S.C.
4  § 1332(a)(1)(B) is to be reviewed under a de novo standard unless
5  the benefit plan gives the administrator or fiduciary
6  discretionary authority to determine eligibility for benefits or
7  to construe the terms of the plan." <u>Firestone Tire & Rubber</u>
8  <u>Co. v. Burch</u>, 489 U.S. 101 (1989).  The plan must unambiguously
9  confer discretion on the administrator or fiduciary to invoke the
10 abuse of discretion standard of review.  <u>Abatie v. Alta Health &</u>
11 <u>Life Ins. Co.</u>, 458 F.3d 955, 962 (9th Cir.2006) (en banc) (citing
12 <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1090 (9th Cir.)
13 (en banc)).

14    Plaintiff argues de novo review is the applicable standard
15 of review in this case because "[t]here is [ ] no plan document
16 in this administrative record."  Plaintiff further argues that
17 the policy is not valid because it is in the name of the
18 predecessor company, Jefferson.

19    Defendant counters that its denial of Plaintiff's benefits
20 should be reviewed for abuse of discretion because the "Plan
21 expressly grants Lincoln the discretion to construe the plan
22 terms and to determine a claimant's eligibility benefits."
23 Defendant supports this position by referring to the Policy that
24 is a part of the administrative record and the Declaration of
25 Greg Russo with accompanying exhibits.  Defendant also argues
26 that the policy is valid because the merger between Jefferson and
27 Lincoln merely changed the name of the Company.
28 ///

1    **1.   The Policy Constitutes the ERISA Plan at Issue in
     this Case.**

2

3        Plaintiff argues in her Trial Brief that de novo review is
4   appropriate because "[t]here is [ ] no plan document in the
5   administrative record."  Lincoln counters that the Policy is the
6   same as the plan and that Plaintiff has waived her right to claim
7   otherwise by not objecting earlier to the sufficiency of the
8   administrative record.  Defendant also contends that if the
9   Policy is an insufficient record of the written terms of the plan
10  then Plaintiff's claims must fail because the administrative
11  record would not contain any evidence of the relevant terms of
12  the plan.

13       Plaintiff's contention that there is "no plan document" is
14  unavailing as this Court and the Ninth Circuit have previously
15  rejected such an argument.  "'[T]he [group disability] insurance
16  policy is the [ERISA] plan document in this case.'"  <u>Rein v.
17  Standard Ins. Co.</u>, 2010 WL 3034178 (quoting <u>Sterio v. HM Life</u>,
18  No. 08-17426, 2010 WL 750032, at (9th Cir. Mar. 4, 2010)
19  (rejecting plaintiff's argument that "there is no plan document,
20  only an insurance policy," citing <u>Cinelli v. Security Pacific
21  Corp.</u>, 61 F. 3d 1437, 1441 (9th Cir.1995) (stating "it is clear
22  that an insurance policy may constitute the 'written instrument'
23  of an ERISA plan")).

24       The Court may admit evidence not included in the
25  administrative record under both the de novo and the abuse of
26  discretion standards of review.

27  ///

28  ///

1   See Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 973 (9th

2   Cir.2006) (en banc)(allowing additional evidence under de novo

3   review if necessary to adequately review the record and allowing

4   additional evidence under abuse of discretion review when a

5   procedural irregularity resulted in an incomplete record).

6           Even when procedural irregularities are smaller,
            though, and abuse of discretion review applies, the
7           court may take additional evidence when the
            irregularities have prevented full development of the
8           administrative record. In that way the court may, in
            essence, recreate what the administrative record would
9           have been had the procedure been correct.

10  Abatie, supra, 458 F.3d at 973.

11          Neither party moved to augment the record; however, in

12  response to Plaintiff's Opening Trial Brief, Defendant provided

13  additional documents[3] supported by a declaration to rebut

14  Plaintiff's contention that the policy does not reflect the plan.

15  These documents assist the Court with establishing a foundation

16  for what standard of review should be applied and do not

17  supplement the record with additional evidence as to the denial

18  of Plaintiff's claims.  The Court will allow the Declaration of

19  Greg Russo and accompanying exhibits to augment the record.

20          Plaintiff' contention that Defendant bestowed discretionary

21  authority to itself is not supported by facts.  Plaintiff

22  provides no evidence to demonstrate that the Policy is

23  inconsistent with the terms of the plan.  Moreover, Plaintiff

24  rebuts her own contention by referring to the policy as the plan

25  in other portions of her argument.

26

27          [3]  Lincoln submitted the following documents: "Certificate
    of Group Long Term Disability Insurance," "Summary Plan
28  Description," and "Merger and Name Change Endorsement"

1  (¶¶ 4 and 5 of Plaintiff's Opening Trial Brief ("see AR 84 'other
2  income benefits' and 81 'Amount' of benefits"; "See AR 81, 'Total
3  Disability (1); see also 69 'Own Occupation'"))

4      Plaintiff also fails to support her bare contention that
5  Defendant has failed to prove that the Summary Plan Description
6  ("SPD") was provided to Plaintiff.  Plaintiff's reliance on the
7  unpublished <u>Gertjejansen</u> case is unavailing.  In <u>Gertjejansen</u>,
8  the issue was whether a revised SPD that was only placed on the
9  company's website was sufficient notice to the employee within
10 the terms of the statute.  <u>Gertjejansen v. Kemper Ins. Companies,</u>
11 <u>Inc.</u>, 2008 WL 1787484 (9th Cir. 2008).  Plaintiff has not
12 provided any evidence that the SPD was revised at any time or
13 that she was not provided the SPD.  Plaintiff did not put this
14 issue before the court, in her complaint or otherwise, until her
15 Supplemental Opening Brief.  Plaintiff's sole argument is that
16 such evidence is not in the record.  Defendants have produced the
17 Certificate of Insurance and SPD supported by the Declaration of
18 Greg Russo confirming that these documents were provided to
19 Plaintiff's employer for distribution to qualified members.  The
20 Policy is a part of the Administrative Record and Plaintiff has
21 relied on that same Policy for other portions of her argument.

22     The Court finds that the Declaration of Greg Russo, the
23 Certificate of Insurance, the Merger and Name Change Endorsement,
24 the Policy contained in the Administrative Record, and
25 Plaintiff's own reliance on the Policy, together, provide a
26 sufficient indicia of reliability to accept the Policy contained
27 in the administrative records as an accurate reflection of the
28 plan.

1           **2.**   **The Abuse of Discretion Standard of Review Applies**

2                  **to Plaintiff's ERISA Claim.**

3       It should be noted that the Court finds no merit in

4 Plaintiff's argument that Jefferson and Lincoln have engaged in

5 subterfuge behind the employer and employee's backs.  Jefferson

6 and Lincoln are the same Company under the terms of the policy

7 because Jefferson became Lincoln after the merger.

8      This Court accepts the Policy as the plan's written

9 instrument.  The relevant policy language is included in a

10 section entitled "COMPANY'S DISCRETIONARY AUTHORITY" and

11 provides:

12       Except for those functions which this policy
        specifically reserves to the Policyholder or Employer,

13       the Company has the authority to manage this Policy, to
        administer claims, to interpret Policy provisions, and

14       to resolve questions arising under this policy.  The
        Company's authority includes (but is not limited to)

15       the right to:

16           1.   Establish and enforce procedures for
              administering this Policy and claims under

17               it;

18           2.   Determine Employees' eligibility for
              insurance and entitlement to benefits; and

19

20           3.   Determine what information the company
              reasonably requires to make such decisions.

21      The Summary Plan Description ("SPD") describes Westamerica

22 Bancorporation as the Sponsor of the Plan and the Plan

23 Administrator.  The SPD further provides:

24       The Plan Administrator is responsible for the Plan and
        is the designated agent for the service of legal

25       process for  the Plan. Functions performed by the Plan
        Administrator include: the receipt and deposit of

26       contributions, maintenance of records of Plan
        participants, authorization and payment of Plan

27       administrative expenses, selection of the insurance
        consultant, selection of the insurance carrier and

28       assisting Jefferson Pilot Financial Insurance Company.

1   Jefferson Financial Insurance Company has the sole
2   discretionary authority to determine eligibility and to
    administer claims in accord with its interpretation of
3   policy provisions, on the Plan Administrator's behalf.

4        This language unambiguously confers discretionary authority

5   upon the Company (i.e Jefferson and subsequently Lincoln) to

6   construe and interpret the plan and make final benefits

7   determinations.  Therefore, the abuse of discretion standard of

8   review applies to Plaintiff's ERSIA claim.  See Abatie v. Alta

9   Health & Life Ins. Co., 458 F.3d 955, 963-64 (9th Cir.2006)

10  (en banc) (holding that abuse of discretion standard of review

11  applies if a plan grants the power to construe and interpret the

12  plan and to make final benefit determinations).

13       Plaintiff's reliance upon Madden v. ITT Long Term Disability

14  Plan for Salaried Employees, 914 F.2d 1279 (9th Cir. 1994) for

15  the proposition that the employer or employee did not confer

16  discretion upon Lincoln is unpersuasive.  As stated above, the

17  SPD shows that Plaintiff's employer and plan sponsor, Westamerica

18  Bancorporation, conferred discretion on Defendant.

19       In accordance with Abatie, this Court finds that the

20  language of the plan unambiguously confers discretion upon

21  Lincoln.  Accordingly, the Court will apply the abuse of

22  discretion standard of review.

23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

26

**B.   Conflict of Interest**

Where a plan grants discretionary authority to the
administrator or its fiduciary, as does the plan in this case,
the court reviewing the denial of benefits is to apply an abuse
of discretion standard.  However, the review should be "informed
by the nature, extent, and effect on the decision-making process
of any conflict of interest that may appear in the record."
<u>Abatie</u>, <u>supra</u>, 458 F.3d at 967.

Plaintiff contends that a higher level of skepticism is
appropriate in this case because Defendant is both the funding
source and administrator of the plan.  Such a conflict of
interest does not change the standard of review; however, it is a
factor for the Court to consider in determining whether Lincoln
abused its discretion.  <u>Metropolitan Life Insurance Co. v. Glenn</u>
554 U.S. 105, 108 (2008).  The significance afforded such a
conflict depends on the facts of the particular case.  <u>Id.</u>

Because the Court finds evidence of a conflict of interest,
the Court will review Lincoln's decision with an amount of
skepticism consistent with Ninth Circuit authority:

> Where, as in this case, the plan gives the
> administrator discretion, and the administrator has a
> conflict of interest, we are to judge its decision to
> deny benefits to evaluate whether it is reasonable.
> Reasonableness does not mean that we would make the
> same decision. We must judge the reasonableness of the
> plan administrator skeptically where, as here, the
> administrator has a conflict of interests. Even without
> the special skepticism we are to apply in cases of
> conflict of interest, deference to the plan
> administrator's judgment does not mean that the plan
> prevails. "Deference" is not a "talismanic word [ ]
> that can avoid the process of judgment." <u>Glenn, supra</u>,
> 128 S.Ct. at 2352.

1  Solomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 675
2  (9th Cir. (Cal.) 2011).

3

4      **C.   Abuse of Discretion Factors**

5

6      The Ninth Circuit has articulated the standard for an abuse
7  of discretion review as follows:

8          The meaning of "abuse of discretion" is elucidated in
           our en banc decision in United States v. Hinkson,
9          585 F.3d 1247 (9th Cir. 2009) (en banc). There we held
           that the test for abuse of discretion in a factual
10         determination (as opposed to legal error) is whether
           "we are left with a definite and firm conviction that a
11         mistake has been committed," and we may not merely
           substitute our view for that of the fact finder. Id.
12         at 1262 (citation and quotation omitted). To do so, we
           consider whether application of a correct legal
13         standard was "(1) illogical, (2) implausible, or
           (3) without support in inferences that may be drawn
14         from the facts in the record." Id. (citation and
           quotation omitted). That standard makes sense in the
15         ERISA context, so we apply it, with the qualification
           that a higher degree of skepticism is appropriate where
16         the administrator has a conflict of interest.

17  Solomaa, supra, 642 F.3d at 676.

18      Plaintiff argues that this case is analogous to Solomaa and
19  contends that Lincoln's actions failed to address the physical
20  and mental issues of the Plaintiff.  Plaintiff argues that
21  further skepticism is warranted because the record reflects a
22  parsimonious claims granting history.  The Court finds
23  Plaintiff's argument unpersuasive.

24  ///
25  ///
26  ///
27  ///
28  ///

                              28

1    **1.    Plaintiff's Assertion That Every Doctor Who**
2    **Actually  Treated Plaintiff Concluded That She Was**
     **Disabled Is Legally Insufficient and Factually**
3    **Misleading.**

4        "Nothing in [ERISA] suggests that plan administrators must

5    accord special deference to the opinions of treating physicians.

6    Nor does [ERISA] impose a heightened burden of explanation on

7    administrators when they reject a treating physician's opinion."

8    Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

9        Moreover, Plaintiff's assertion is not supported by the

10   record.  Plaintiff received a second opinion from a U.C. Davis

11   physician.  The second opinion report is conspicuously absent

12   from the record; however, Plaintiff reported to Dr. Peterson that

13   the U.C. Davis physician thought that it was "all in her head."

14   This is in stark contrast to Plaintiff's assertion that every

15   doctor who personally examined Plaintiff concluded she was

16   disabled.

17

18   **2.    Lincoln's Reliance on the Absence of Objective**
     **Evidence of Plaintiff's Disability Is Not**
19   **Analagous to Solomaa.**

20

21       In Solomaa, the plaintiff was diagnosed with Chronic Fatigue

22   Syndrome.  Solomaa, supra, 642 F.3d at 669.  A method of

23   diagnosing Chronic Fatigue Syndrome is by conducting a litany of

24   tests to rule out other possible diagnoses. Id. at 677.  The lack

25   of objective findings in ruling out other potential ailments is a

26   key indicator of the ultimate diagnosis of Chronic Fatigue

27   Syndrome.  Id.

28   ///

In this case, however, there is no evidence in the record to indicate that Plaintiff is suffering from any disability that would be diagnosed on the basis of a lack of objective findings. In fact, Plaintiff's own physician concedes that her work related restrictions stem from her subjective complaints of pain and not from objective medical findings.

The Court rejects Plaintiff's argument on the basis that no evidence has been provided to indicate that Plaintiff's claimed disability would be diagnosable by a lack of objective findings as was the Chronic Fatigue Syndrome in Salomaa.

> **3.   Lincoln Was Not Bound by the Social Security Rating; However, Failing to Inform Plaintiff Why it Disagreed with the Rating May Be a Failure to Consider Evidence.**

ERISA plan administrators are not bound by Social Security determinations because the standards of proof between Social Security and ERISA are different. See Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009); See Nord, 538 U.S. at 832-33 (noting differences between the two standards, including the fact that the former allows for more reliance on treating physicians' opinions, and the latter is especially sensitive to the terms and design of each particular plan). However, the Ninth Circuit has held that failure to discuss why the plan rejected the Social Security determination may be a relevant factor:

///

///

///

While ERISA plan administrators are not bound by the
SSA's determination, complete disregard for a contrary
conclusion without so much as an explanation raises
questions about whether an adverse benefits
determination was "the product of a principled and
deliberative reasoning process." See MetLife I, 461
F.3d at 674; see also MetLife II, 128 S. Ct. at 2352;
cf. id. at 2361 (Scalia, J., dissenting). In fact, not
distinguishing the SSA's contrary conclusion may
indicate a failure to consider relevant evidence. See
MetLife II, 128 S.Ct. at 2355 (Roberts, C.J.,
concurring in part and concurring in the judgment).

. . .

Although the Plan places the burden on Montour to
submit "written proof" of his disability, that is, the
pertinent documents and information necessary to
facilitate a disability determination, regulations
promulgated by the Secretary of Labor authorize, if not
require, plan administrators working with an apparently
deficient administrative record to inform claimants of
the deficiency and to provide them with an opportunity
to resolve the problem by furnishing the missing
information. See 29 C.F.R. § 2560.503-1(f)(3)-(4),
(g)(1)(iii); see also Saffon, 522 F.3d at 870 ("In
resolving [Montour]'s claim for benefits, [Hartford]
was required to give [him] 'a description of any
additional material or information' that was
'necessary' for [him] to 'perfect the claim[.]' ..."
(quoting 29 C.F.R. § 2560.503-1(g)(1)(iii) (alterations
omitted))). We have also construed this regulation to
require a plan administrator denying benefits in the
first instance to notify the claimant not just of the
opportunity for internal agency review of that decision
but also of what additional information would be
necessary "to perfect the claim [.]" Chuck v. Hewlett
Packard Co., 455 F.3d 1026, 1032 (9th Cir.2006).

Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 635.

On October 14, 2008, Lincoln received notice of the Social

Security award.  On October 17, 2008, Lincoln informed Plaintiff

that the Social Security award was not binding and would merely

be a factor in its decision.  On October 21, 2008, Defendant

received a copy of the Social Security disability award.

///

///

Unfortunately, the letter from Social Security does not provide anything more than the conclusion that Plaintiff has been determined to be disabled.  There is nothing in the record connecting the Social Security disability with Plaintiff's thumb or mental health conditions.  On February 4, 2009, Lincoln denied Plaintiff's first appeal without mentioning the Social Security disability rating.  On August 10, 2009, Lincoln denied Plaintiff's final appeal without mentioning the Social Security disability rating.  Despite the lack of evidence as to the precise nature of Plaintiff's Social Security disability or how it was determined, Lincoln's complete failure to mention or discuss why it disagreed with the disability determination may indicate a disregard of potentially relevant evidence.

**4.   Lincoln Did Not Provide Shifting Reasons for Denying Plaintiff's Claim, Nor Did it "Sandbag" with Regard to Plaintiff's Mental Health Claim.**

At each step of the appeal Plaintiff provided new evidence of treatment that post-dated the prior appeal.  To the extent Defendant expanded upon its prior reasons for denying benefits, it did so in response to Plaintiff's additional evidence.

On December 12, 2006, Lincoln denied benefits because the records indicated that Plaintiff was no longer impaired by the original reason for her disability payments, carpal tunnel syndrome.  Furthermore, Lincoln articulated that Plaintiff's records also reflected subjective complaints of thumb pain with a negative grip test and positive range of motion.

///

Based on the job analysis form provided in Plaintiff's claim
file, Plaintiff's thumb complaints were determined to not prevent
her from performing the main duties of her job.  Accordingly, the
letter fully addressed plaintiff's original claim for carpal
tunnel disability and the additional complaints of thumb pain.

On February 26, 2008, Lincoln informed Plaintiff that
additional benefits would be paid for the period of November 19,
2006 through June 25, 2007 due to Plaintiff's thumb surgeries.
As of June 25, 2007, Plaintiff's own physician had cleared her to
return to work.  Plaintiff had not submitted any additional
evidence regarding the main duties of her job and Lincoln denied
the claim beyond June 25, 2007 for the same reason.  "[T]he
evidence in the file does not support ongoing restrictions and
limitations to render Ms. Parks unable to perform the main duties
of her occupation as a mortgage servicer."

On February 4, 2009, Lincoln informed Plaintiff that her
appeal was still denied beyond June 25, 2007.  Lincoln denied the
claim on the basis that the "medical documentation does not
support that there are restrictions and limitations that would
render your client unable to perform her own occupation" as of
June 25, 2007.  Lincoln noted that the earliest record of mental
health treatment was February 5, 2008.  Lincoln further denied
Plaintiff's mental health claim on the basis that there was "no
evidence to support low GAF scores as your client's treatment
appears conservative and symptoms are not described in intensity,
duration, or frequency to suggest they would interfere with
functioning or performing the main duties of her occupation."
///

33

Lincoln indicated that the records show that Plaintiff has been evaluated by, but is not receiving regular treatment, from the two providers and that her "symptoms are reactions to difficult external circumstance" but are "not indicative of global psychiatric impairment."

On August 10, 2009, Lincoln informed Plaintiff that her final appeal was denied beyond June 25, 2007.  Lincoln again denied the claim on the basis that the medical evidence in the file does not support the conclusion that Plaintiff was unable to perform the main duties of her occupation as a mortgage servicer as of June 25, 2007.  Plaintiff's psychiatric claim was again denied for lack of evidence indicating illness, symptoms, or treatment of an intensity, duration, or frequency that would prevent Plaintiff from working.  Lincoln emphasized that Plaintiff's psychiatric treatment has been sporadic with inconsistency in reported symptoms and that there are no records indicating that her mental health condition prohibited her from returning to work as of June 25, 2007.

### 5.   Lincoln Did Not Fail to Engage in a Meaningful Dialogue with Plaintiff.

Plaintiff's only compelling argument as to a lack of a meaningful dialogue on the part of Lincoln stems from the failure to respond to why it disagreed with the Social Security rating. However, on its own, this failure is insufficient to find that Lincoln failed to engage in a meaningful dialogue with Plaintiff.

///

///

34

Every time Plaintiff provided new evidence to support her claim, Defendant had the evidence evaluated by an appropriate medical professional.  Defendant afforded Plaintiff the opportunity to review and respond to each of these reports prior to rendering a decision.  Plaintiff disagrees with the reports; however, the dialogue was nonetheless meaningful.

The dubious mistake of Dr. Kruszewski in identifying Dr. Millon as treating Plaintiff does not demonstrate a lack of meaningful dialogue.  Plaintiff was asked to provide a rebuttal to Dr. Kruszewski's report by July 27, 2009, but failed to respond to this report until August 10, 2009, the same date that Lincoln denied Plaintiff's final appeal.  Because Plaintiff failed to put Defendant on notice of this mistake before it rendered its final decision, Lincoln's repeat of the mistake in its final demand letter does not indicate a failure of dialogue with Plaintiff.

### D.   Review of Lincoln's Decision

Several facts are in Plaintiff's favor; namely, Lincoln's conflict of interest, its use of multiple reviewing physicians from the same company, and its failure to address why it disagreed with the Social Security disability finding.  However, on the whole, the Court finds that these factors are insufficient to find that Defendant abused its discretion.

///

///

///

Lincoln initially paid disability benefits due to
Plaintiff's Carpal Tunnel Syndrome.  After successful surgery,
those benefits were terminated.  On appeal, Lincoln paid further
benefits based on Plaintiff's subsequent thumb surgeries.
Benefits were not paid beyond June 25, 2007, however, given
Plaintiff's physician's own evaluation and a lack of medical
evidence to support Plaintiff meeting the Total Disability
definition of the plan.  The work related restrictions identified
by Dr. Peterson were solely based on Plaintiff's subjective
complaints and not on objective findings.  Plaintiff received a
second opinion from a U.C. Davis physician.  Plaintiff reported
to Dr. Peterson that her impression was that the U.C. Davis
physician believed it was "all in her head."

The opinions of the vocational consultants differ with
respect to the main duties of Plaintiff's actual occupation.
Plaintiff's vocational expert focused his reports on discrediting
the duties identified by Plaintiff's employer as "simplistic."
However, the lengthy tables provided by Mr. Schilling merely
outline the duties and activities of "similar occupations."  The
tables do not address the major hand tasks associated with those
duties.  Mr. Schilling jumps from these tables to the conclusion
that Plaintiff's occupation required "almost constant writing
and/or typing."  The tasks identified by Plaintiff's employer
were allegedly "simplistic" because they were exclusively limited
to the "major tasks requiring use of one or both hands."
Plaintiff's employer, however, identified these tasks as typing
(both hands), calculating (one hand), writing (one hand), and
lifting (both hands).

1  Based on this description, which does not appear to be lacking,

2  four board certified orthopedic surgeons concluded that Plaintiff

3  was not "totally disabled" within the meaning of the plan.  These

4  are common tasks and it is not beyond a doctor's expertise to

5  determine whether Plaintiff could perform them.

6      With respect to Plaintiff's mental health deficits, the

7  first such documented record is seven months after payments were

8  terminated and was performed as part of a pre-surgery screening.

9  Plaintiff underwent a further assessment five days later.  The

10 "results of the assessment indicate no significant cognitive

11 impairments in memory or reasoning."  Plaintiff's subsequent

12 treatment was sporadic with inconsistent reporting.

13     Based on the foregoing, the Court finds that Lincoln's

14 decision was not arbitrary or capricious, and that Lincoln did

15 not abuse its discretion in denying Plaintiff's claim for long-

16 term disability benefits.

17

18                          **CONCLUSION**

19

20     For the reasons set forth above, judgment shall be entered

21 in favor of Defendant.

22     IT IS SO ORDERED.

23 Dated: August 21, 2012

24

25                          _____

26                          MORRISON C. ENGLAND, JR.
                            UNITED STATES DISTRICT JUDGE

27

28

37